**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Subchapter V |
| | ) | |
| Ferrari Importing Inc. d/b/a GAMMA Sports, | ) | Case No.  26-20738 |
| | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | Honorable _____ |

**DECLARATION OF MATTHEW FERRARI IN SUPPORT OF
BANKRUPTCY PETITION AND FIRST DAY MOTIONS**

I, Matthew Ferrari, hereby declare as follows:

1. I am the President and Chief Executive Officer (collectively, "**CEO**") of the debtor-in-possession in this bankruptcy case, Ferrari Importing Inc. d/b/a GAMMA Sports (the "Debtor" or the "Company")), and I have been involved in the Debtor's preparation for the commencement of this case. I have held that position since June of 2004 when I was appointed by my father, Harry Ferrari, who was the founder. I have been an employee of the Company since 1984.

2. As CEO of the Debtor, I have extensive familiarity with the day-to-day operations, business affairs, books, and records of the Debtor. I am authorized by the Debtor to submit this Declaration. I am familiar with the Debtor's relationships with its debtors, creditors, and all other relevant individuals and entities concerning the Debtor's ongoing business operations.

3. I submit this declaration (this "**Declaration**") pursuant to 28 U.S.C. § 1746 in support of the Debtor's voluntary petition for reorganization under subchapter v of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and first day motions and applications filed contemporaneously herewith. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and/or my opinion based upon personal experience and knowledge of the Debtor's business and financial

condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**Commencement of the Chapter 11 Case**

4.      On March 16, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of the Bankruptcy Code.  The Debtor intends to continue the business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, with the intention of restructuring certain debt and until such time as it is able to sell substantially all of its assets, as detailed herein.

5.      Part I of my Declaration provides a brief background on the Debtor. Part II sets forth the circumstances giving rise to the commencement of this chapter 11 case.  Part III describes the relevant facts in support of the various first day motions (the "**First Day Motions**") and applications (the "**Applications**") filed by the Debtor concurrently with, or shortly after, the filing of this Declaration.  I am familiar with the First Day Motions and the Applications filed by the Debtor.

**I.      BACKGROUND**

6.      The Debtor is a Michigan closely held corporation formed on February 2, 1963, with offices located at 200 Waterfront Drive, Pittsburgh, PA 15222, where it has been located since the Spring of 1992.

7.      The Debtor designs, manufactures, and sells equipment, accessories, and related products in the racket sports and paddle sports spaces throughout the United States and abroad.  In particular, Debtor manufactures and/or distributes and sells sporting goods such as tennis string, tennis balls, tennis racquets, pickleball paddles, racquet stringing machines, BallHopper® brand pickup baskets, and other accessories.  In its ordinary course of business, the Debtor leverages

2

strong relationships with vendors, distributors, and customers located around the world, many of which relationships have existed for decades.

8.      The Debtor was originally formed to sell unique tennis strings in the 1960s based on an invention of its founder, Harry Ferrari, which was a mechanism for stringing tennis racquets that is protected by US Patent 4,015,133.  Additional product lines were rapidly added to the Company's offering, including grips, pickup baskets, sweatbands, and other accessories.

9.      The Company's tennis strings were so significantly better than other natural or synthetic strings available on the market that an expert independent organization in the paddle/racquet sports space, the United States Racquet Stringers Association, rated the Company's synthetic strings No. 1 in the marketplace for 23 consecutive years.

10.      Harry Ferrari passed away on August 3, 2016.  His surviving wife suffered from dementia and passed away on April 6, 2020.  As a result of their passing and pursuant to their estate plans, the owners of the Company since that time have been Matthew Ferrari (owning approximately 50.37% of the Company); and (ii) Alex Ferrari (owning approximately 49.63% of the Company).

## II.      CIRCUMSTANCES GIVING RISE TO THIS CHAPTER 11 CASES

11.      The Debtor has been forced to file this bankruptcy case based on temporary cash flow issues, which are due to three main causes: (i) the Shareholder Litigation; (ii) the Citizens Litigation; and (iii) the Company's ordinary course long term business strategy that has hit a temporary cash flow snag based on cyclical attributes of the pickleball, paddle, and padel markets/spaces.

*A.*      *The Shareholder Litigation*

12.      First, I will address the Shareholder Litigation (as defined below).  On August 25, 2023, Alex Ferrari instituted a lawsuit against Matthew Ferrari, which case is docketed in the U.S.

District Court for the Western District of Pennsylvania at <u>Alex Ferrari v. Matthew Ferrari</u>, Case No. 2:23-cv-1541 (the "**Shareholder Litigation**").

13. The ownership interests of Alex Ferrari and Matthew Ferrari, respectively, in the Debtor are part of the subject matter of the Shareholder Litigation. However, there are several other assets and interests at stake in the Shareholder Litigation, including the contents of multiple separate family related trusts and other assets such as the ownership interests in Sport Technology Group, LLC, a Pennsylvania limited liability company, that owns the building where the Debtor is located.

14. As part of his litigation strategy in the Shareholder Litigation, Alex Ferrari's counsel deposed Amanda Gilchrist, former relationship manager of the Company's primary and sole lender, Citizens Bank, N.A. ("**Citizens**"), on May 15, 2024 (the "**Gilchrist Deposition**").

15. Seemingly as a result of that deposition and/or based on the sheer existence of the Shareholder Litigation and without prior notice or warning, Citizens demanded payment in full under its loan documents by correspondence sent to the Company on or about March 11, 2025 (the "**Initial Demand Correspondence**"). At that time, counsel for Citizens listed the amount demanded as totaling $1,652,750.00.

16. Of particular note, prior to Citizens' inexplicable demand for payment in full through the Initial Demand Correspondence, the Company at all times met each and every one of its obligations under the Citizens loan documents and Citizens did not once even allege any sort of breach by the Company. To that extent, it appears that the only possible explanations for Citizens demanding payment at that time and since that time are: (i) the Gilchrist Deposition in particular; and (ii) the Shareholder Litigation in general.

17.     Citizens followed up the Initial Demand Correspondence with multiple additional pieces of correspondence reiterating that demand, while simultaneously: (i) discontinuing the Company's ability to draw on its loan of credit, which had a maximum amount of $2 Million under the applicable loan documents and which has never been drawn beyond approximately $1.6 Million; (ii) charging the default interest rate of approximately twelve and one half percent (12.5%) effective back to April of 2025 (which exceeded the regular interest rate of approximately six and one half percent (6.5%) to seven and one half percent (7.5%) under the loan documents), which amounts it has swept out of the Debtor's account and which payment requirement the Debtor has successfully met each and every time Citizens has drawn it; (iii) reducing the Debtor's credit limit on its corporate credit card with Citizens, spanning the differences between (a) a maximum original credit limit of $300,000.00 as of April 3, 2021, to (b) a reduced limit of $100,000.00 as of March 10, 2025, to (c) a further reduced limit of $40,000.00 as of August 27, 2025, to (d) the lowest amount of $25,000.00 that is now in effect and has been in effect since February 2, 2026, while at the same time failing to provide notice of each such credit limit reduction until weeks after those reductions were effectuated, which has caused the Debtor significant business disruption and financial hardship for over a year in its attempt to conduct ordinary course business; (iv) making the demand for payment in full of the demand note under the existing loan documents without prior notice or warning through the Initial Demand Correspondence on March 11, 2025; and (v) ultimately, instituting the Citizens Litigation (as defined below).

18.     In another more recent maneuver in the Shareholder Litigation, Alex Ferrari's counsel filed Plaintiff's Emergency Motion to Appoint a Receiver (Doc. No. 44) in the Shareholder Litigation (the "**Ferrari Receivership Motion**") on September 23, 2025. In the Ferrari Receivership Motion, Alex Ferrari restated all of the same allegations he had made with regard to

5

the Company throughout the case, with the only difference being the relief requested, which relief was based on equitable principles.

19. The Court in the Shareholder Litigation entered orders requiring the parties to the Receivership Motion, which ultimately included each of Alex Ferrari, Matthew Ferrari, the Company, and Citizens, to extensively brief the issues involved in the Ferrari Receivership Motion extensively, which briefing was concluded in early December of 2025.

20. Notwithstanding the significant effort required from each of the parties to the Receivership Motion and the detailed briefing completed and submitted, the Court in the Shareholder Litigation issued an Order of Court dated February 23, 2026 (Doc. No. 73) (the "**Special Master Order**"), advising the parties that it did not feel that it had the requisite knowledge or expertise to evaluate the issues presented in a dispositive manner.  In the Special Master Order, the Court further directed that: (i) a special master would be required; and (ii) on or before March 12, 2026, the parties were to submit the name(s) of a "JD/CPA" who might have the requisite knowledge and/or expertise actually to evaluate the issues in a dispositive way.

21. The parties to the Shareholder Litigation, Alex Ferrari and Matthew Ferrari, both submitted the name of a potential candidate to be appointed as a special master in that case recently.

B.      *The Citizens Litigation*

22. Second, I will address the Citizens Litigation (as defined below).

23. Apparently due to the confounding machinations of the Court in the Shareholder Litigation, including the Court's issuance of the Special Master Order, on February 25, 2026, Citizens felt compelled to institute a new civil action in the Allegheny County Court of Common Pleas alleging breach of its existing loan documents, which case is docketed at Citizens Bank, N.A.

v. Ferrari Importing Company d/b/a GAMMA Sports, Case No. G.D. 26-002214 (the "**Citizens Litigation**").

24. Through the Complaint filed in the Citizens Litigation, Citizens alleges breach of contract as well as demanding the appointment of a receiver. Procedurally, Citizens just effectuated service of its Complaint on the Company on Friday, March 13, 2026.

25. As expected and as confirmed separately by counsel for Citizens, Citizens will be seeking the emergency appointment of a receiver in that case as soon as possible, given that service has now been made.  As a result, there are now two pending requests for appointment of a receiver over the Debtor in two different jurisdictions: (i) in the Shareholder Litigation (the U.S. District Court for the W.D. Pa.); and (ii) in the Citizens Litigation (the Allegheny County Court of Common Pleas).

C. *Temporary Cash Flow Issues*

26. Third, I will address the cash flow shortage and cyclical business issues presented by the Company's recent, temporary financial underperformance.

27. The Company experienced significant growth during the time period from 2019 through 2022 as a result of a focus on a rising opportunity in its space to sell pickleball paddles, balls and other equipment, resulting in rapidly increasing sales and profits.  Specifically: (i) the Company's gross income increased over its 2019 performance by 29% in 2020 and then further increased in 2021; and (ii) the Company's net income net income doubled from 2019 to 2020 and then increased nearly nine times (9X) from 2020 to 2021, resulting in an enhanced ability to continue building the momentum of the Company's rising pickleball opportunity.

28. In pursuance of that opportunity, the Company doubled its marketing and advertising spend in 2022 to capitalize on strong 2021 momentum and to remain competitive in

the pickleball space in particular.  However in 2022, there was an influx of over 1,000 new brands into the pickleball space industry wide, presenting a new challenge to continued growth.

29.     Given its substantial success in the pickleball, paddle, and padel spaces and significant additional opportunities in those same spaces thereafter, the Company made the strategic decision to focus even more on those areas, including by making significant investments through building up inventory and product offerings to be presented to customers moving forward, with the specific intention to differentiate itself in the new, more expansive pickleball market. While the Debtor remains well positioned to optimize those opportunities, its sales have slowed in recent quarters, resulting in declining financial performance.

30.     In large part, the Company's sales have slowed recently, further exacerbating its cash-flow pressure, due to employee turnover during the pendency of the Shareholder Litigation. During that timeframe, the Company lost an entire sales team, including a vice president, a national accounts manager, and an inside sales representative, as well as a customer service representative and an e-commerce manager. That turnover contributed to minimal sales in the fourth quarter of 2025 and has further hindered current cash flow.

31.     Although the Company has demonstrated performance that fails to meet its normal course, overwhelmingly stable results over the past 50+ years in recent quarters, it is clear that the Debtor maintains a positive position to correct its course over the next several quarters and into the future, based on its significant inventory in those areas and recent improving sales efforts and results.

D.     *Efforts to Obtain Alternative Financing Outside of Bankruptcy*

32.     For a year or more, the Company has been exploring and evaluating options for new lenders to replace Citizens in an attempt to rectify the non-monetary default that Alex Ferrari's

8

litigation tactics caused. The Company has engaged in detailed discussions with several traditional lenders and non-traditional lenders, given the substantially overmarket interest that Citizens has been charging during that timeframe pursuant to its default interest rate that the Company has paid in full without fail from the outset.

33. To provide a specific example, the Company engaged in substantial conversations with Austin Financial Services, a lender that actually submitted a definitive term sheet offering a new lending facility to take Citizens out on the morning of September 24, 2025. Of course, unbeknownst to Austin Financial Services, Alex Ferrari had filed the Ferrari Receivership Motion the prior evening, September 23, 2025.

34. Austin Financial Services was clear with the Company that it remained interested and motivated to enter into a new loan deal with the Company until just recently, in the hopes that the Court in the Shareholder Litigation would have denied the Ferrari Receivership Motion based on the extensively researched and well-articulated briefing completed and submitted in that case.

35. In the absence of Alex Ferrari and his counsel filing the Ferrari Receivership Motion that remains pending, it seems nearly certain that the Company would have been able to obtain alternative financing to replace Citizens months ago.

36. However especially given the Court's recent directive concerning the appointment of a special master in the Shareholder Litigation and the institution of the Citizens Litigation, even Austin Financial Services finally decided to move on recently.

*E.* *Conclusion*

37. Due to temporary cash flow issues, but additionally given: (i) the ongoing Shareholder Litigation, including the pending Ferrari Receivership Motion and that Court's recent directive regarding the appointment of a special master; and (ii) the new Citizens Litigation

9

pursuant to which counsel for Citizens has assured counsel for the Debtor that Citizens will momentarily seek the emergency appointment of a receiver, the Debtor has no other options other than this bankruptcy filing at this time.

## **STRATEGY/GOALS OF THIS BANKRUPTCY CASE**

38.     At its core, bankruptcy is intended both to enable the debtor to consolidate many separate claims and lawsuits into a single forum in the most efficient and effective way and to enable as fresh of a start as possible.

39.     With all of the above in mind, the Debtor decided that the benefits of the Bankruptcy Code and the automatic stay presented the best option to enable it to regroup, avoid the appointment of a receiver in one of multiple venues that would unnecessarily sink the business, and to provide a solid path forward.

40.     Through this bankruptcy case, the Debor intends to improve its recent financial performance, strengthen its cash flow position, continue operating the manifestly successful business it has operated since the 1960s, to replace its current lender that has been and remains inexcusably deleterious to its business, and to move GAMMA Sports into the future as the newest iteration of a traditionally successful strong business.

## **III.     First Day Motions and Applications[1]**

41.     Concurrently with the filing of this chapter 11 case, the Debtor filed first day motions seeking authority to maintain operations and preserve value. Capitalized terms used in this Part III and not otherwise defined herein have the meanings ascribed to them in the corresponding motion.

---

[1] Capitalized terms in Part 3 of this Declaration have the meaning ascribed to them in the corresponding first day motion discussed in each subpart.

*A. Expedited Motion for Order Authorizing Payment of Prepetition Wages and Related Payroll Obligations*

42.     As of the Petition Date, the Debtor employs 26 full-time individuals. Those employees perform critical functions essential to the Debtor's business operations, including importing operations, distribution logistics, warehouse management, sales, administration, and customer service.

43.     The employees' knowledge and understanding of the Debtor's business operations, supplier relationships, and customer accounts are indispensable to the continued operation of the Debtor during this chapter 11 case. Without the continued, uninterrupted services of these employees, the Debtor's business operations would be materially impaired.

44.     The Debtor maintains regular payroll schedules managed through the GUSTO payroll system, with 26 pay cycles per calendar year. The payroll data for pay days falling between February 22, 2026 and March 8, 2026 reflects total prepetition gross earnings of $79,416.94, employee tax withholdings of $18,242.30, and employer taxes of $7,214.82.

45.     In addition to payroll taxes, the Debtor's payroll process includes ordinary-course deductions and contributions related to employee benefits and programs, including 401(k) contributions, health-related deductions, dental, vision, flexible spending account contributions, and similar payroll deductions and remittances.

46.     I believe that it is crucial to minimize the personal hardship that employees would suffer if prepetition wage and payroll obligations are not paid when due or as expected and to maintain employee morale and retention during this chapter 11 case. I further believe that the relief requested in the wages motion is necessary and appropriate to preserve the Debtor's operations and going-concern value.

*B. Expedited Motion for Order Approving Adequate Assurance of Payment for Future Utility Services and Related Relief*

11

47.     In the ordinary course of its business, the Debtor obtains utility or utility-like services from Peoples Natural Gas, Comcast, Duquesne Light Co., PWSA, PGH Networks, and Waste Management. The Debtor's average monthly aggregate cost for these services is approximately $4,236.43.

48.     Uninterrupted utility service is essential to the continued operation of the Debtor's business. Even a brief interruption in electricity, gas, water, telecommunications, internet, or waste removal would materially impair the Debtor's ability to operate and preserve value for its estate and creditors.

49.     The Debtor intends to pay all postpetition utility obligations in the ordinary course of business as they come due. As additional adequate assurance under section the Debtor proposes to have the right, but not the obligation, in its discretion, to prepay one month of future utility consumption, or any portion thereof, to any utility provider as may be necessary or appropriate to avoid interruption of service.

50.     I believe that the Debtor's commitment and ability to pay postpetition utility charges in the ordinary course, together with the foregoing right to prepay future utility service if needed, constitutes adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code.

### C. Expedited Motion of the Debtor for Entry of an Order Authorizing the Debtor to Maintain Its Existing Bank Accounts and Related Relief

51.     The Debtor's continued operation depends on uninterrupted access to its bank accounts and ordinary-course banking services, including the ability to receive deposits, process checks, initiate wire transfers and ACH payments, and pay ordinary-course operating expenses and chapter 11 administrative expenses.

52. The Debtor's banking and lending relationship is with Citizens. The Debtor's only bank accounts are maintained at Citizens, and the Debtor and Citizens are parties to certain loan documents, including a loan agreement, promissory note, commercial security agreement, and commercial business Mastercard arrangement. The Debtor's cash and proceeds are part of Citizens' asserted collateral package.

53. Requiring the Debtor to close its existing Citizens accounts immediately and establish replacement accounts would create unnecessary disruption to the Debtor's operations at the outset of this case. Maintaining the existing Citizens accounts preserves the Debtor's current cash-receipt and disbursement framework at the same institution that asserts an interest in the Debtor's cash and proceeds, which reduces transition risk while the Debtor's use of cash collateral and adequate protection arrangements are being implemented in this case.

54. The Debtor also seeks authority to continue using its existing checks, invoices, purchase orders, letterhead, and related business forms so as to avoid needless cost and operational inefficiency during the transition into chapter 11.

55. I believe the relief requested in the account-management motion is necessary to avoid operational disruption and to permit the Debtor to continue operating without interruption, while expressly preserving all parties' substantive rights with respect to cash collateral, setoff, adequate protection, and any other rights under the Bankruptcy Code or applicable nonbankruptcy law.

### D. Expedited Motion of the Debtor for Entry of an Order Authorizing Use of Cash Collateral and Granting Adequate Protection

56. Citizens is the Debtor's primary and sole secured lender. The Debtor and Citizens are parties to a loan agreement, promissory note in the original principal amount of $2,000,000 dated May 18, 2022, a commercial security agreement, and a commercial business Mastercard

arrangement. As of the Petition Date, the Debtor's current credit limit on the corporate credit card is $25,000, and the amount of the debt owed to Citizens was approximately $1,761,110.74.

57.     The Debtor seeks authority to use cash collateral in order to pay employee wages and other necessary ordinary-course operating expenses, as well as administrative expenses incurred in this bankruptcy case. Absent the ability to immediately use cash collateral, the Debtor's ability to pay ongoing, necessary postpetition expenses would be severely hampered.

58.     The Debtor proposes to provide Citizens with adequate protection through the continuation of timely monthly payments, the continuation of the Debtor's business operations, and replacement liens to the extent of any actual diminution in value. I believe that the Debtor's continued operations will preserve and maximize value for Citizens and for other stakeholders because the going-concern value of the business is significantly greater than its liquidation value.

59.     I believe the relief requested in the cash collateral motion is essential to enable the Debtor to continue operating while this chapter 11 case proceeds and to avoid immediate and irreparable harm to the estate.

I, Matthew Ferrari, the President and Chief Executive Officer of the Debtor, declare under penalty of perjury that the foregoing is true and correct.

Date: March 16, 2026

/s/ *Matthew Ferrari*
Name:  Matthew Ferrari
Title: President and Chief Executive Officer
Company:  Ferrari Importing Inc. d/b/a GAMMA Sports

0151301.0821249   4917-8300-9176v3

14